UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 22-CR-20104-MARTINEZ/BECERRA

UNITED STATES OF AMERICA,

vs.

MARIO A. PALACIOS PALACIOS,

_____/

### DEFENDANT'S  MOTION TO SUPPRESS EVIDENCE
### AND SUPPORTING MEMORANDUM OF LAW.

Defendant MARIO A. PALACIOS PALACIOS, pursuant to Rule 12(b) of the Federal

Rules of Criminal Procedure, the *Fifth Amendment* to the Constitution, *Miranda v. Arizona,* 384

U.S. 436 (1966), and the additional authorities set forth in the incorporated memorandum of law,

requests that this Court preclude the government from introducing into evidence at trial self-

incriminating statements Mr. Palacios made to FBI agents during the course of two interrogations

conducted in Jamaica on October 7 and October 12, 2021.

Mr. Palacios is charged with: (Count 1) providing material support or resources to carry

out a violation resulting in death, in violation of 18 U.S.C.§ 2339A(a); and (Count 2) conspiring

to kill or kidnap outside the United States, in violation of 18 U.S.C.§ 956(a)(1). The charges stem

from Mr. Palacios's alleged involvement in the assassination of the former President of Haiti,

Jovenel Moise, on July 7, 2021.

Mr. Palacios's motion is based on the following grounds:

### I. Factual Background.

### A. The October 7, 2021 Interrogation.

1. Mr. Palacios, a diminutive Colombia national, had been hiding and barely surviving in

Jamaica for over a month before he was questioned by FBI agents on October 7 (he had entered the country illegally in September). He had no prior experience with the U.S. system of justice nor any familiarity with our laws and constitutional guarantees. He had limited formal education and had just retired from the Colombian army after twenty years of service. Little more about him can be gleaned from the interview.

2. The meeting with the FBI was arranged by Don Carlos LNU ("mi Coronel"), Mr. Palacios's trusted former military commander, who claimed to have contacts in the FBI and know how the U.S. criminal justice system worked (the nature of Don Carlos's actual relationship with the government needs to be better understood, as he may have been acting on its behalf). In a recorded telephone conversation, don Carlos reminded Mr. Palacios that his life was at risk and that his personal safety would be best assured if he met with the FBI in Jamaica and cooperated with them. Don Carlos promised Mr. Palacios that he would travel to Jamaica with the FBI and be present for any meeting they arranged. They agreed that the meeting with the FBI should take place at the U.S. or Colombian embassy in Jamaica, where Mr. Palacios would be safe. Mr. Palacios was told two or three FBI agents would be coming to Jamaica.

3. The interview with the FBI was finally scheduled to take place in the morning of October 7, 2021. Don Carlos told Mr. Palacios the night before that he would be unable to attend the meeting in Jamaica due to Covid-related travel restrictions, but that Mr. Palacios should go ahead without him. He claimed to be in Miami attending meetings with the agents who would be traveling to Jamaica or had already done so that day.

4. When the travelling party arrived at the agreed-upon location to pick up Mr. Palacios, he was shocked to see that *three* vehicles, including a white van, showed up. He expected a car

with only two or three FBI agents in it. He could also see that there were several Jamaican police officers in the three vehicles. In his follow-up interview, Mr. Palacios would say: "I got scared. I got scared. I got scared because Don Carlos told me it was just you two that were going to go."

5. The white van with several Jamaican policemen in it pulled up next to him and an FBI agent came out. One cannot forget that the FBI believed Mr. Palacios had been part of a team of armed Colombian commandos who shot up the President's home and killed him. The agent who got out of the van acted accordingly. Once he identified Mr. Palacios, the agent physically moved Mr. Palacios to the van and told him to put his hands on the vehicle. He then patted Mr. Palacios down and used a metal detector or wand to search for weapons. Mr. Palacios could not understand why he was being treated so harshly. During his second interrogation, Mr. Palacios would complain: "Why so much violence? I was not liking it." Inside the van, two Jamaican policemen sat up front (one driving), the agent and another policeman were in the middle row, and Mr. Palacios and a fourth Jamaican police officer sat in the back. The Jamaican policemen were all in uniform and armed.

6. The van took off followed or surrounded by the other two vehicles. Although Mr. Palacios believed they would be meeting at an embassy, he was told that the interview would actually take place at a hotel. Mr. Palacios protested the change of plans, to no avail. By this time, Mr. Palacios had lost all control over his circumstances. The initial voluntariness of the encounter had quickly dissipated. He was now in the hands of law enforcement.

7. When they arrived at a hotel, the FBI who patted him down and several Jamaican policemen walked him up to the room where the meeting was to take place. The armed Jamaican police stayed outside when Mr. Palacios entered the room. There, he was met by three FBI

agents. Although they were polite to Mr. Palacios (they buttered him up with breakfast), he felt scared and out of place in this strange location. He knew immediately that he was not free to leave (this would be made expressly clear to him before the interrogation was over). Although he suspected they were not, he did not know for sure whether any or all of the agents were armed. Furthermore, having no money or knowledge of the area and also unable to speak English, Mr. Palacios had no way of getting back home even if he were released or managed to escape. He was also in the country illegally. In sum, he was away from the public eye and utterly at the mercy of the surrounding U.S. and local law enforcement officers. His freedom of action was completely curtailed.

8. The interrogation began at 11:05 a.m. and ended at 4:45 p.m., *almost six hours* later. As the questioning unfolded and throughout the interview, Mr. Palacios was *never* told he was free to leave (that would have been a joke). He was *never* assured that he was not a suspect; on the contrary, he was told he was being questioned due to his known involvement in the deadly attack at the President's home. Most important, he was *never read his Miranda rights* or had any version of them explained to him.

9. Mr. Palacios's lengthy interrogation was video-taped (an unpaginated transcript was also produced in discovery). The agents suspected or knew that Mr. Palacios had previously said he had gone into the President's home, not to kill him, but to help local authorities arrest him pursuant to a valid arrest warrant, which he had seen. Mr. Palacios repeated that story, which was itself self-incriminatory, to the agents. The agents, however, were hoping to get Mr. Palacios to admit that he *knew* that the plan was to *kill* the President *before* he entered the house. The agents were relentless in their pursuit of that admission, and Mr. Palacios repeatedly *denied* that he had

any *prior* knowledge of a scheme to kill the President. He maintained that he had never agreed to carry out such a mission. He also insisted (and continues to maintain) that he never fired his weapon in the President's home.

10. However, after *five and a half hours* into the interrogation (at about 4:12 p.m.), Mr. Palacios finally capitulated and said he had been told of the change of plans (from arrest to murder) the night *before* the events. This crucial admission came after Mr. Palacios asked the agents to pause the recording machine so they could speak privately. The intermission lasted an unspecified number of minutes. During that brief unrecorded conversation, Mr. Palacios asked the agents if they would allow him to return to Colombia for just a few days to deal with pressing family issues. He promised then to fly to the United States to continue to assist the FBI (there appear to be no FBI reports reflecting what was said during the intermission). The agents informed him that travelling to Colombia would be impossible. Of course, the FBI *never* had any intention of allowing Mr. Palacios to slip though their fingers.

11. Thus, once they obtained the information they wanted and ended the interrogation, the FBI told Mr. Palacios that he would now be placed in the custody of the Jamaican authorities. Mr. Palacios spent the night in the hotel with two Jamaican policemen in the room. The FBI returned to the hotel the following day to further explain to Mr. Palacios that he would be detained due to his unlawful entry into the country. He was then handcuffed and transported to a nasty local jail, where he stayed for five days before the FBI questioned him again.

**B. The October 12, 2021 Interrogation.**

12. Handcuffed, Mr. Palacios arrived at his second meeting with the FBI on October 12,

2021, in the custody of the Jamaican police. He arrived in the afternoon because he had spent the morning in a clinic with signs of dengue or malaria. Armed Jamaican officials transported Mr. Palacios *directly* from the clinic to the hotel. Entering the room, he said he felt "sick, sick." He had been "sleeping on a piece of cardboard," which made his back pain hurt even more. He was weakened, hungry, dirty, and miserable. He asked if he "could take one of these little soaps and a shampoo" back to his jail cell.

13. The second interrogation took place at the same hotel used on October 7. Four FBI agents, including at least two who had previously interrogated him, were waiting in a room. Once again, Jamaican police stood outside. The interrogation began at 3:27 p.m. and ended *over five hours* later at 8:45 p.m. A transcript (unpaginated) of the encounter has been produced in discovery.

14. Upon entering the room, Mr. Palacios immediately complained about having been "locked up with the police" following the initial meeting. He felt as though he had been tricked into attending that meeting (he had been told he "would be like a protected witness"). The agents pressed him to agree that the first interview "was a voluntary interview, right?" Mr. Palacios said, "Mm" Given Mr. Palacios's unsatisfactory response, the lead agent asked: "Yes or no?" Mr. Palacios's second response was equally useless: "Well…[pause]." According to the transcript, Mr. Palacio gave "no audible response" when asked *again* to confirm that the prior interview "was done voluntarily, right?" and that he not been "threatened."

15. Mr. Palacios also asked "what will happen to me" when I get to Miami? The agent explained he would "probably" be charged with "conspiracy to commit this crime." Mr. Palacios worried that he would be in prison for "ten years, fifteen years…imagine that." The lead

interrogator re-assured him: "*One year, two years,* we just don't know." The first thing to do now, however, was "to cooperate." He returned to that subject a few minutes later: "You said ten or fifteen, and it *could be one or two*, there is no way to know" (the guidelines for these offenses call for life in prison). Of course, the agents added that there were no guarantees.

16. However, as one agent explained: "The idea is also that you will cooperating [sic] with the investigation, you have the opportunity to cooperate with the investigation. And that is the important part." It was a "one-time opportunity [to cooperate], to be honest with you," he was told. The other agent attempted to reassure him: "You are the only one getting that." That agent had already said that the Court would be made aware of Mr. Palacios's cooperation, "that is why the truth is very important. *The truth will help you.*"

17. When the agents later mentioned that they had agreed he "would go to the United States to give testimony and declare yourself guilty at trial," Mr. Palacios jumped: "Declare myself guilty?" He was not inclined to do that. "Thing is, I'm not a criminal man!" he later exclaimed.

18. *About an hour into the interrogation* (at about 4:28 p.m.), the lead agent told Mr. Palacios that, because he was now in Jamaican jail, he needed "to inform you of your rights under foreign custody." Reading or paraphrasing from a written waiver form, the agent explained that "Although we are not in the United States of America, the U.S. laws provide you with certain rights when dealing with us." He continued to read Mr. Palacios a modified version of the customary statement of *Miranda* rights, including, he said, the right to have an attorney "designated" to him before any questions were asked (Miranda warnings typically refer to court "appointed" counsel). "However," he added, "the possibility of providing a lawyer at this time

7

can be limited by the decisions made by the local authorities or by the *availability* ("disponibilidad") of a qualified lawyer in the United States." This observation had the intended effect of discouraging Mr. Palacios from requesting the appointment of counsel and derailing the interrogation. To suggest that there was a *lack of qualified lawyers in the United States available* to assist Mr. Palacios was plainly unfair. Court-appointed defense counsel here are living proof of the inaccuracy of that statement. Furthermore, the use of the Spanish word "disponibilidad" for "availability" was confusing since that term can be understood to require the attorney's "willingness," which is not a condition of the *Miranda* protection.

19. Although it is not entirely clear, it appears Mr. Palacios signed the waiver form *before* his rights were summarized for him. Furthermore, he was *not specifically asked* whether he understood each of his several *Miranda* rights. Thus, he *never explicitly said* he understood and wished to waive each of them. The waiver form he signed does *not* provide for his signature or initials next to the description of each right he is foregoing, which would more clearly show his understanding of the rights being waived. *After* getting Mr. Palacios to sign the form containing a slanted and diluted version of his *Miranda* rights, the interrogating agent immediately launched into his continued interrogation. Mr. Palacios docilely followed along.

20. During the course of the lengthy second interrogation, Mr. Palacios repeated that the plan had never been to assassinate the President: "They always talked to us about an arrest warrant, always, an arrest warrant-arrest warrant, always." Mr. Palacios had already told the agents that "of course" he believed the warrant to be "legitimate." After a certain amount of pressure, however, Mr. Palacios eventually admitted that the original plan to arrest the President *changed* in "the middle of the night" before the raid on July 7. It was then, according to Mr.

8

Palacios, "when they said-they said that [the plan] was to put an end to the President."

21. Toward the end of the interview, upon further questioning about his willingness "to cooperate with the investigation," Mr. Palacios said, "Of course, yes, sir. I am willing to cooperate." However, he added: "What I am asking is to keep my freedom, brother, so I can raise my children. That's what I ask. That's why I am collaborating." Deflecting Mr. Palacios's attempt to negotiate a deal for himself, the agent simply said: "And we thank you."

22. Later, when the agent asked Mr. Palacios to confirm that they were "in agreement" that he was willing to come to the United States to testify and declare himself guilty, Mr. Palacios was surprised and dismayed, saying only: "Declare myself guilty?" The agents then tried to calm him down.

## MEMORANDUM OF LAW

### A. The October 7 Statement was Obtained in Violation of *Miranda* because *Miranda* Warnings were Not Given.

The Fifth Amendment provides, in pertinent part, that [n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Constitution amendment V.  In *Miranda*, the Supreme Court held that the Fifth Amendment required that a suspect be given a warning before *custodial interrogation* begins. *See Miranda*, 384 U.S. at 448-450. "If the rule is violated, the answers to the questions asked him are inadmissible in evidence." *United States v. Slaight*, 620 F.3d 816, 817 (7th Cir. 2010). When a statement is taken from an uncounseled suspect during the course of an interrogation, "a *heavy burden* rests on the government to demonstrate that the defendant knowingly and intelligently waved his privilege against self-incrimination." *Hart v. Atty. Gen.*, 323 U.S. 884, 891-92 (11th Cir. 2003) (emphasis added)

"Custodial interrogation" means "questioning initiated by law enforcement officers after a

person has been taken into custody *or otherwise deprived of his freedom of action in any significant way.*" *Id.* at 444. As the agents here acknowledged, *Miranda* applies to custodial interrogations conducted by U.S. law enforcement on foreign soil investigating violations of U.S. laws. *See, e.g., United States v. Heller,* 625 F.2d 594, 599 (5th Cir. 1980) ("joint venture"); *Pfeifer v. Bureau of Prisons,* 615 F.2d 873, 877 (9th Cir. 1980) (same). The "deterrent effect" underlying the exclusionary rule is especially important when, as here, U.S. authorities are *solely* conducting the interrogation. *Cf. United States v. Odoni*, 782 F.3d 1226, 1238 (11th Cir. 2015).

The only issue here is whether Mr. Palacios was "in custody" for *Miranda* purposes when he was interrogated on October 7. This requires the Court to determine whether a person in Mr. Palacios's shoes "would have understood his freedom of action to have been curtailed to a degree associated with a formal arrest." *See Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). It is an objective test. "The only relevant inquiry is how a reasonable man in the subject's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). The "subjective views harbored by either the interrogating officers *or* the person being questioned" are irrelevant. *Stansbury v. California*, 511 U.S. 318, 323 (1994) (emphasis added). In determining whether a suspect is in custody, courts consider the "totality of the circumstances." *See, e.g., United States v. Helmel,* 769 F.2d 1306, 1320 (8th Cir. 1985).

The facts here compel the conclusion that Mr. Palacios was "in custody" for Miranda purposes *at least* from the time U.S. and Jamaican law enforcement officials walked him into a room at a non-descript hotel in Jamaica, where the questioning took place. By that time, an agent had already nudged or pushed Mr. Palacios against a vehicle, patted him down, scanned him, and placed him in the back of a van occupied by five law enforcement officials. The van, part of a

three-vehicle law enforcement caravan, had then driven to an unknown location (not the safe haven where he expected to go). There, he was questioned by three (possibly armed) FBI agents while armed Jamaican policemen stood outside.

*At least by the time he was brought into the room*, anyone in Mr. Palacios's shoes would have known that his "freedom of action" had been seriously curtailed and he was not free to leave. Although he did not ask for permission to leave (until he later asked for permission to visit his family in Colombia for a few days), he was never told that he *could* leave, and it was painfully obvious that he *could not*.   In a foreign country whose customs and language he did not understand, Mr. Palacios had nowhere to go and no way to get there. He was completely at the mercy of his interrogators, who made it clear he was in deep trouble for his role in the assassination of the President.

The agents seemed to convince themselves that *Miranda* warnings were not necessary because Mr. Palacios, or someone purporting to act on his behalf, had *approached them* about setting up the meeting. They clearly *wished* to question him without giving him the warnings. This calculated decision to avoid spooking Mr. Palacios by reading him his rights is precisely the sort of the exclusionary rule is designed to deter. *See United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010) (noting that "police sometimes are restive under the restraints imposed by the [*Miranda*] rule and seek to circumvent it by avoiding the appearance of custody") *citing Thompson v. Keohane*, 516 U.S. 99, 102-03 (1995).

Thus, in *United States v. Hanson,* 237 F.3d 961 (8th Cir. 2001), the Court vacated a defendant's conviction for attempted arson because the district court improperly admitted non-*Mirandized* statements he made to the police. Federal agents had gone to Hanson's home as part

11

of their investigation into an attempted *arson* at an abortion clinic. They told him they were investigating recent *vandalism* at the clinic and wanted to show him some photographs (they did not initially tell him he was the prime suspect in the attempted arson).

Hanson *agreed* to accompany them to the field office. He rode in the back seat of the agents' locked government car to the federal building and entered the underground parking garage. They walked up an interior stairwell to a room measuring six by eight feet. There, Hanson was questioned for about two hours and admitted having attempted to start a fire at the clinic. He was with the agents for at least three hours in total. They never read Hanson his *Miranda* rights, including his right to counsel, until *after* he confessed to everything and agreed to provide a written statement.

Although the agents told Hanson they had "enough to arrest you" and threatened time in federal prison "if he did not cooperate," they assured him he was *not* under arrest and "free to leave" at any time, and even offered to "drive him home" if he wished to go back (Hanson "was dependent upon the agents to find his way out of the building and back to his home). In light of the totality of circumstances, the Court held that Hanson had been "in custody" when he was questioned and that his non-*Mirandized* self-incriminating statements, therefore, should have been suppressed. In reaching its conclusion, the Court considered "the length of interrogation, the suspect's freedom to leave, the place and purpose of the interrogation," as well as other factors, including whether the agents had created "a police-dominated, intimidating environment." The Court found that, despite the agents' offer to drive him home, a "reasonable person in Hanson's position would not have believed he was free to leave the field office unhindered by the agents."

Similarly, in *United States v. Slaight,* 620 F.3d 816 (7th Cir. 2010) (per Posner, J.), the

Court vacated a defendant's conviction for possession of child pornography based on the police officers' violation of his *Miranda* rights. A number of local and federal officers arrived at Slaight's house early one morning to execute a search warrant. When no one answered the door, they forced it open with a battering ram and entered the house with weapons drawn. The officers wanted to question Slaight but wanted to do so without giving him *Miranda* warnings. 620 F.3d at 818. Their admitted "goal was to get [him] to incriminate himself." *Id.* at 819. For various ostensibly neutral reasons, the officers also agreed they preferred not to question Slaight in his home.

The officers *did not command* that Slaight come with them to the police station. They merely told him they preferred to interview him there. They asked whether he would "consent to a voluntary interview." They offered to let him drive himself to the station, asking him "if he would be willing to follow us to the Rock Island Police Department" for the interview. They knew, however, that Slaight had a suspended driver's license. There was therefore "little danger," the Court observed, that "he would accept the invitation." Slaight ended up being driven to the police station by two officers in their car. At the station, he was questioned for about an hour in a small (possibly eight by eight feet) windowless room. The door of the room remained closed throughout the interview.

Although they never offered to drive him home, the police repeatedly assured Slaight that he was free to leave. Under the circumstances, however, the Court found that "he couldn't have believed they would actually let him go." Slaight's suspicion was confirmed when he asked to leave the room for a moment to smoke a cigarette and he was not allowed to do so. "Anyone in his situation would have thought himself in custody," the Court concluded.

As is the case here, the fact that the police were polite to Slaight did not render the interrogation any less custodial or unconstitutional. "[B]eing polite to a suspect questioned in a police station and telling him repeatedly that he's free to leave do not create a safe harbor for police who would prefer to give *Miranda* warnings after the suspect has confessed rather than before." *Id.* at 821 (citations omitted).

Finally, even questioning that takes place in a non-custodial setting or in surroundings familiar to the suspect (which is inherently less coercive) has be deemed to be "custodial." *See, e.g. Orozco v. Texas*, 394 U.S. 324, 325-56 (1969) (in custody because although questioned at home, suspect was interrogated by several officers in his bedroom at 4 a.m.); *United States v. Mittel-Carey*, 493 F3d 36, 39-40 (1st Cir. 2007) (in custody because although questioned at home, eight officers maintained control over suspect and interrogation began at 6:25 a.m., lasting between 90 and 120 minutes); *United States v. Cavazos*, 668 F.3d 190, 194-95 (5th Cir. 2012) (in custody because although suspect was questioned at home and told the interrogation was non-custodial, he had been initially handcuffed, separated from his family, and monitored when he used the telephone or the bathroom).

Cases in which police interrogations have been found *not to be* "custodial" involve instances in which the defendant is more clearly unrestrained and "free to leave." Thus, in *California v. Beheler,* 463 U.S. 1121 (1983), the Supreme Court held that *Miranda* warnings were not required where "the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview." *Id.*

In *Beheler* the defendant had *called the police* to report a killing. The gun used in the killing was found in Beheler's backyard, after he consented to a search of the property. Later that

evening, Beheler voluntarily *agreed to go* with the police to the station. He had been specifically told he was not under arrest. After a non-*Mirandized* interview that "lasted less than 30 minutes," Beheler was allowed to go back home, only to be arrested five days later in connection with the murder. Following his arrest, he was advised of his rights and waived them. He then gave a second, taped confession concerning his involvement in the murder.

In *Beheler*, the Supreme Court emphasized that "Beheler's freedom was not restricted in *any way whatsoever*." *Id.* at 1123 (emphasis added). The holding in *Beheler* is only that "Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id.* at 1125 (citation omitted); *see United States v. Phillips*, 812 F.2d 1355 (11th Cir. 1987) (suspect who accompanied officers to the police station for questioning was not in custody where he was not placed under arrest, nor handcuffed, nor locked into the office at the station and officers testified that he "could have left the police station at any time"); *United States v. Luna-Encinas*, 603 F.3d 876 (11th Cir. 2010) (defendant was not in custody where questioning "lasted some five minutes" and defendant "was on familiar ground in his own front yard"). In contrast, Mr. Palacios was questioned in a secret location and his freedom was very much "restrained."

### B. The October 12 Statement was Obtained in Violation of *Miranda* because Mr. Palacios was Not Properly Advised of his Rights and did Not Validly Waive Them.

A signed *Miranda* "waiver form does not have talismanic powers; it is merely one piece of evidence to be considered in the totality of circumstances analysis." *Hart v. Atty. Gen.*, 323 F.3d at 893 n.18 (11th Cir. 2003); *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent … is not inevitably

… sufficient to establish waiver").

Here, Mr. Palacios's further admissions on October 12 should be suppressed because any purported waiver of Mr. Palacios's *Miranda* rights during the second interrogation was impermissibly tainted by the government's earlier violation of his Constitutional rights. Having already admitted everything *before* he was read his rights, Mr. Palacios could not be expected to exercise his Miranda rights when he was finally informed of them.

Thus, in *Mo. V. Seibert,* 542 U.S. 600, 611-15 (2004), a plurality of the Court held that a suspect's confession, made *after Miranda* warnings were given, was still inadmissible because the suspect had been previously questioned *without Miranda* warnings as a deliberate tactic to elicit a confession. The suspect's *Mirandized* confession was made about 15 to 20 minutes after her unwarned admission. Upon requestioning the suspect, the police read the suspect her *Miranda* rights, reminded her of her prior incriminating statements, and elicited the same confession. *Id.* at 604-05. For a "midstream" *Miranda* warning to be effective, the plurality held that the suspect must understand that he or she can choose whether or not to give a statement *regardless* of what he or she said prior to the warning. *See also Oregon v. Elstad*, 470 U.S. 298 (1985).

Similarly, in *United States v. Street*, 472 F.3d 1298 (11th Cir. 2006), the Court of Appeals held that the rule announced in *Seibert* requires suppression of a post-*Miranda* confession if the two-step interrogation technique is used in a calculated way to undermine the *Miranda* warning. In *Street*, the Court held that "if an officer employs a strategy of deliberately questioning an in-custody suspect without any *Miranda* warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took *specific curative steps* to ensure that the mi-interrogation

16

warnings achieved the purpose the *Miranda* decision intended." *Id.* 1314 (emphasis added).

The agents here did not take the curative steps needed to eliminate the taint of Mr. Palacios earlier non-*Mirandized* confession. Rather than scrupulously honor *Miranda*'s requirements before commencing the second interview, the agents rushed through their diluted and misleading warnings. Furthermore, they did not even immediately inform Mr. Palacios of his *Miranda* rights the second time around until about *an hour* into the interrogation.  *See also United States v. Green*, 541 F.3d 176, 192 (3rd Cir. 2008) (exclusion of defendant's statements warranted when police deliberately failed to provide *Miranda* warnings during initial interrogation and second interrogation was conducted by same agents, occurred in same location, and repeated same questions), *vacated on other grounds,* 556 F.3d 151, 158 (3rd Cir. 2009); *cf. United States v. Tovar*, 719 F.3d 376, 388 (5th Cir. 2013) (second confession admissible because no evidence agents exploit pre-*Miranda* statements to obtain post-*Miranda* confession).

There are other reasons why *Miranda* requires the suppression of Mr. Palacios's October 12 admissions.  It is well-known that, before the government may introduce a suspect's self-incriminating statements into evidence at trial, it must prove that he "voluntarily, knowingly, and intelligently" waived his *Miranda* rights. *See Miranda,* 384 U.S. at 475. The government must prove by a *preponderance of the evidence* that Mr. Palacios waived his rights. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

In general, the government must show that the suspect voluntarily relinquished his rights, and that he was fully aware of the rights he was waiving and the consequences of waiving those rights.  *See id.*; *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) (government must show that the waiver represented an "uncoerced choice" and the defendant understood both the "nature of

the right being waived and the consequences of waiver"). In *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991), the Court of Appeals held that, before the government may introduce a suspect's uncounseled statement made during custodial interrogation, the government must show that: the relinquishment of the right was the product of a "free and deliberate choice" rather than intimidation, coercion, *or deception*; and the "waiver must have been made with the awareness of both the right being abandoned and the consequences of the decision to abandon that right."

To determine whether a waiver of *Miranda* rights was valid, courts will consider the "totality of the circumstances" surrounding an interrogation. *See Moran*, 475 U.S. at 475. Factors relevant to determining whether a waiver of constitutional rights was valid include the person's intelligence, education, and age; familiarity with the criminal justice system; and physical and mental condition.   *See, e.g., Henry v. Dees,* 658 F.2d 406, 411 (5th Cir. 1981).  Although an express waiver is not necessary, *see, e.g., United States v. Beckles,* 565 F.3d 832, 837 (11th Cir. 2009), no waiver of *Miranda* rights will be presumed from a defendant's silence or subsequent self-incriminating statement alone. *See Miranda,* 384 U.S. at 475

Here, the government cannot show that Mr. Palacios "voluntarily, knowingly, and intelligently" waived his *Miranda* rights. Mr. Palacios arrived at his second meeting with the FBI in handcuffs directly from a clinic where he was given medication for various ailments. He felt "sick, sick." He had just spent five miserable days in a local Jamaican jail. He had been "sleeping on a piece of cardboard," which aggravated his back pain. He had previously been hiding and barely surviving in Jamaica for over a month. He had no prior experience with or understanding of our system of justice. He felt he had been tricked into meeting with the FBI in the first place.

By the time he was advised of a modified version of his *Miranda* rights, Mr. Palacios was in a debilitated and vulnerable state. He was in shape to "voluntarily, knowingly, and intelligently" waived his *Miranda* rights.

Furthermore, when provided with the modified version of his rights, Mr. Palacios was never asked, and never said, that he understood each and every one of his rights he was giving up. He never said so during the interview and the form he signed, which did not provide for placing his initials next to each *Miranda* right he was waiving, did not make it clear that he fully understood his rights and wished to waive them. Here, the agents plainly wanted to avoid the formalities and the *Miranda*'s legalese for fear that it would scare off Mr. Palacios. In the process, however, they failed to advise him of his rights correctly.

More fundamentally, *any measure of waiver* here was also impermissibly induced by *seriously misleading* remarks the agents made. For example, the lead agent's comment about the questionable "availability of a qualified lawyer in the United States" to assist Mr. Palacios if he wished to be represented by counsel obscured the fact that Mr. Palacios had a Constitutional *right* to *appointed* counsel if he could not afford one. Thus, in *United States v. Botello-Rosales*, 728 F.3d 865 (9th Cir. 2013), the Court vacated the defendant's drug-trafficking and firearms convictions because they were based on self-incriminating statements obtained as a result of a constitutionally inadequate *Miranda* warning. In relevant part, the Detective in *Botello-Rosales* informed the suspect (in Spanish) that, "If you don't have the money to pay for a lawyer, you have the right. One, who is free, could be given to you." *Id.* at 867. The Court held that this formulation of the right to counsel was constitutionally deficient because it "suggests that the right to counsel is *contingent* on the *approval* of a request or on the lawyer's *availability*, rather

than the government's absolute obligation." *Id.* (emphasis added).

Similarly, the agent's assertion here that Mr. Palacios's right to counsel depended on the "*availability* of a qualified lawyer in the United States" did not "reasonably convey" his constitutional right to counsel. *See id.* Not only was that assertion inaccurate, but it unduly suggested that the right to counsel was contingent on other factors, rather that "absolute."

Furthermore, the Spanish term the agents used for *availability* ("disponibilidad") may also have suggested that Mr. Palacios's right to appointed counsel depended on the *"willingness"* of an attorney to handle the case. Although "*Miranda* warnings [need not] be given in the exact form described in that decision," *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989), the suggestion that the appointment of counsel required the "willingness" of an attorney to handle the case is also not entirely true and deviates too far from the standard *Miranda* warning.

Additional gratuitous comments the agents made further rendered Mr. Palacios's purported *Miranda* waiver invalid. The agent's warning that it was "important" for Mr. Palacios to be truthful ("the truth is very important") and that "*the truth will help you"* was *especially* fatal to the validity of his *Miranda* waiver. This was almost exactly the case in *Hart*, 323 F.3d at 893, where the Court of Appeals held that a suspect's waiver of his right to remain silent was invalid because it was "the product of deception." Specifically, during the course of a discussion of the "pros and cons" of hiring a lawyer, the Detective *told the suspect that "honesty wouldn't hurt him."* This statement was impermissibly deceptive because it "contradicted the *Miranda* warning that anything he said could be used against him in court." The Detective's comment was "incompatible" with the Miranda warning against making self-incriminating statements.

Similarly, in *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991), the Court of

Appeals found the defendant's *Miranda* waiver to be invalid because he had been told that "signing the waiver form would not hurt him." Although there is more than one way to inform a suspect of his or her *Miranda* rights, "the warnings must not be misleading." *Id.* In *Beale*, the Court that by telling the suspect that "signing the waiver would not hurt him," the agent "contradicted the Miranda warning that a defendant's statements can be used against the defendant in court." The agent's statement, therefore, was "misleading … concerning the consequences of relinquishing his right to remain silent." Id.

Here, as shown by the government's intention to introduce his admissions into evidence at trial, speaking the "truth" certainly *did not help* Mr. Palacios. The agent's asertion to the contrary contradicted the basic message *Miranda* warnings are designed to provide. The false statement that "the truth will help you" improperly convinced Mr. Palacios to waive *Miranda.*

The validity of Mr. Palacios's *Miranda* waiver is also fatally undercut by the agent's repeated suggestion that Mr. Palacios might only have to spend *one or two years* in prison for his role in the President's assassination (and the shooting of his wife) if he cooperated with the government. The agent must have known or could have easily found out (he seemed to be on the telephone with government counsel at various times during the interview) that the statute and sentencing guidelines for the offense Mr. Palacios was thought to have committed provided for *life in prison*, even after a guilty plea. While a certain amount of misinformation is allowed in the interrogation context, to float the idea that Mr. Palacios might be sentenced to only *one or two years* in prison for conspiring to kill an individual (and seriously injuring another) rises to the level of impermissible trickery and deception.

WHEREFORE Mr. Palacios requests that the Court preclude the government from

introducing into evidence at trial statements obtained from him in violation of his *Miranda* rights.

Respectfully submitted,

JOAQUIN MENDEZ, P.A.
251 Valencia Avenue, No. 141447
Coral Gables, Florida 33114
Telephone (305) 606-5193
By:*s/ Joaquin Mendez*
Joaquin Mendez,  Esq.
Florida Bar No. 0814652
jm@jmendezlaw.com

ALFREDO IZAGUIRRE, P.A.
338 Minorca Avenue
Coral Gables, Florida 33134
Telephone (305) 442-0425
By:
*s/ Alfredo Izaguirre*
Alfredo Izaguirre, Esq
Florida Bar No. 13556
alfredo@izaguirrelaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of October, 2022 I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*s/ Joaquin Mendez*
Joaquin Mendez,  Esq.

22