**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-CR-20104-MARTINEZ/BECERRA(s)(s)**

**UNITED STATES OF AMERICA**

**vs.**

**MARIO ANTONIO PALACIOS PALACIOS,**

   **Defendant.**

_____/

**<u>GOVERNMENT OPPOSITION TO</u>**
**<u>DEFENDANT'S MOTION TO SUPRESS EVIDENCE</u>**

The United States of America, by and through the undersigned Assistant United States Attorneys, hereby files its response to the motion to suppress filed by defendant Mario Antonio Palacios Palacios ("defendant" or "PALACIOS"), (DE 74).  First, defendant argues that his statements made during his first non-custodial interview should be suppressed because agents did not advise him of his *Miranda* rights.  Second, defendant asserts that post-*Miranda* statements made during a second subsequent interview should likewise be suppressed because they were tainted by his prior non-Mirandized statement and his *Miranda* waiver was either not knowing or incomplete.  His arguments fail on the merits.

The defendant requested the first meeting with the agents, and the totality of the circumstances demonstrate that he was not in "custody."  Moreover, prior to the second interview, which occurred days later, agents properly advised the defendant of his *Miranda* rights, and he knowingly and voluntarily waived those rights.  As such, the defendant's motion should be denied.

1

## I.      <u>Factual Background</u>

On July 7, 2021, Haitian President Jovenel Moïse was assassinated in his residence in Haiti. Haitian authorities arrested dozens of suspects after the assassination, including approximately 20 former Colombian military personnel and at least two Haitian-American citizens.  U.S. law enforcement agents ("agents") conducting a separate, but parallel, investigation later learned that PALACIOS, a former Colombian soldier, was present in the President's residence during the assassination.  Agents also learned that PALACIOS, who was hiding in Jamaica, wanted to speak with them to cooperate with American authorities.  After many days of coordination, agents interviewed PALACIOS on October 7 and 12, 2021, in a Jamaican hotel.

### A.      <u>October 7, 2021, Consensual Interview</u>

In approximately late September 2021, PALACIOS's former commanding officer (the "Colombian CO") contacted U.S. law enforcement agents to discuss arranging a meeting between PALACIOS and U.S. agents in Jamaica, where PALACIOS was in hiding.  The Colombian CO told the agents that PALACIOS wanted to cooperate with them (the U.S. agents).  The Colombian CO informed the agents that PALACIOS was concerned that he would be extradited to Haiti if they met at the Colombian embassy.  The agents arranged with the Colombian CO to conduct the interview in a hotel, and initially, PALACIOS would come to the meeting with the Colombian CO. However, on the eve of the meeting, the Colombian CO was unable to travel to Jamaica.  As a result, the Colombian CO connected PALACIOS and an FBI agent via a group chat where PALACIOS coordinated with the FBI agent to arrange a meeting with PALACIOS.  PALACIOS does not speak English, so all communications were in Spanish.

1.      PALACIOS Transportation to Interview Location

On October 7, 2021, PALACIOS texted the FBI agent his pick-up location, which was in a rural, and remote part of Jamaica.  The FBI agent informed PALACIOS that it would take them over two hours to reach him.  This part of Jamaica was unsafe, and for this reason, approximately 10 law enforcement officers traveled in four vehicles to pick up PALACIOS.  The lead car was an 18-person van with 6 law enforcement officers inside (4 U.S. agents and 2 Jamaican police officers).  All U.S. law enforcement officers were dressed in civilian clothes, but they had bullet proof vests underneath their clothing for officer safety.  The Jamaican police officers were in uniform.

As law enforcement approached the rendezvous area, PALACIOS texted that he was not at the agreed-upon location and instead sent a photo of a nearby telephone tower and described the road.  When the FBI agent told PALACIOS that they were close to him, PALACIOS emphasized that he needed to get into the vehicle quickly.  Once law enforcement arrived at the tower, PALACIOS surfaced from nearby bushes and ran toward the van.  A U.S. agent exited the van to confirm PALACIOS's identity.  Two additional U.S. agents also exited the van; no firearms were brandished at any point.

The FBI agent, who had been communicating with PALACIOS by text, exited a different vehicle to introduce herself and handed PALACIOS a bottle of water.  Another agent then asked PALACIOS if he had any weapons.  PALACIOS stated he had a machete in the backpack he was carrying.  The agent removed the backpack from PALACIOS, handed it to another officer in the van, and proceeded to pat down PALACIOS against the hood of the car for officer safety.  Once

the agents determined that PALACIOS had no other weapons, other than the machete, PALACIOS was invited into the van and the FBI agent returned to one of the other cars.

Law enforcement did not handcuff or restrain PALACIOS in any way.  He chose his own seat in the back row of the van with full view of all other occupants.  An agent sat with PALACIOS in that row.  The other three agents spread out in the other rows of the van, with the Jamaican police officers in the driver's row, behind a glass partition.

Once the van doors closed, PALACIOS wept and expressed how thankful he was that U.S. law enforcement found him.  He also repeatedly thanked God that he was now safe.  He described the danger he had been in since the assassination, how some of his associates had died, and how he had been given only a single daily meal since arriving in Jamaica.  The agent reassured PALACIOS that he was safe and handed him a backpack with snacks, water, and Gatorade. PALACIOS began to calm down, eating and drinking the items provided.

During the two-and-a-half-hour drive, PALACIOS and the agent, who was previously stationed in Colombia, engaged in small talk about PALACIOS's hometown in Colombia. PALACIOS talked about his family and how much he missed his wife and daughter.  During the drive, PALACIOS asked to stop for a bathroom break.  Because there were no bathroom facilities on the rural highway they were on, the agents pulled over so PALACIOS could relieve himself on the side of the road.  An agent got out of the vehicle and opened the door for PALACIOS.  Another agent, who was seated by the door, also stepped out to allow PALACIOS, who was in the last row, to exit the van.  PALACIOS went to the bathroom and then got back inside the van, and they proceeded to the interview location.

2.    <u>PALACIOS Arrives at Interview Location</u>

The agents conducted the interview at a hotel in Jamaica, as per the original understanding. There were three U.S. agents inside of the hotel room: the FBI agent PALACIOS texted with, and two other agents.  None of them were armed.  The agents informed PALACIOS that they were going to record the interview, to which PALACIOS did not object.  The agents captured the interview on both audio and video recording.[1][2]  PALACIOS was not provided with *Miranda* warnings.  Only U.S. agents were present in the hotel room at the time of the interview.

PALACIOS sat unrestrained on a couch.  The agents ordered more food for PALACIOS. Although PALACIOS wanted to start speaking with the agents, they told him they were in no rush, and they encouraged him to finish his meal.

When it appeared he was no longer eating, the agents asked PALACIOS if he would allow them to review his cellular telephones.  PALACIOS readily agreed and he provided two phones to the agents, along with their passcodes.  As seen on the video in Exhibit 1, PALACIOS watched as the agents reviewed the phones to write down identifying information, and he listened as the agents read to him from a form to obtain his written consent to search the phones.  The agents asked PALACIOS to sign the form (*see* Exhibit 5), which he did slowly, laughing that his hands were shaking because he had not held a pen in a while (Exhibit 2 at MAOO002674).  As one agent took the phones to another room, another provided PALACIOS a bottle of water.

---

[1]    The video recording of the October 7, 2021, interview, along with the English translation, are attached hereto as Exhibits 1 and 2, respectively.  The video recording of the October 12, 2021, interview, along with the English translation, are attached hereto as Exhibits 3 and 4, respectively.

[2]    Upon granting of the Government's Motion to File Electronic Files with the Clerk's Office (DE 95) and the unopposed Motion to File Under Seal (DE 96), the government will file Exhibits 1 through 4 with the Clerk of Court, copies of which had previously been produced in discovery to the defendant.  Courtesy copies will be provided by hand to the Court.

The agents began the interview approximately twenty minutes after the recording started. An agent said "thank you for being here.  You are here voluntarily . . . you asked us to be here," to which PALACIOS interrupted and responded all the while "Yes sir" while nodding his head affirmatively.  The agent continued: "to have this conversation with you as to what occurred in Haiti, right?"  Again, PALACIOS responded "Yes sir."  (Exhibit 2 at MAPP002680).  The agent began by asking PALACIOS some background information about himself.  PALACIOS discussed his background, his military experience and how he ended up in Haiti.  The agents repeatedly asked him if he needed to use the restroom and told him that it was alright if he needed to stop.

PALACIOS told the agents how he was recruited for the job in Haiti; how many of his Colombian former military colleagues were involved; how PALACIOS and the other Colombians arrived in Haiti via the Dominican Republic; how much PALACIOS and the other Colombian former soldiers were going to be paid; who paid for their transportation; which Colombian former soldiers were in charge on the ground in Haiti; and who was responsible for hiring and paying the Colombians.  While PALACIOS talked, the agents showed PALACIOS various photos, and PALACI]OS identified the persons in the photos as he told the agents the timeline of events while he was in Haiti.

After PALACIOS finished recounting the events in Haiti, the agents told PALACIOS that, if there was anything he wanted to change or add to his statement, this was the time.  PALACIOS told the agents that they had not asked him if he took anything from the President's home, and admitted he had taken two watches, a necklace, and some cash from there.

Contrary to information the agents had collected from various sources, PALACIOS claimed he went to the President's house to "arrest" him.  Agents confronted PALACIOS with this

inconsistency, but PALACIOS maintained he did not know about any plan to kill the President. The agents suggested that they take a break, and they went to get PALACIOS more water. PALACIOS then leaned back on the couch and put his hands behind his back, relaxed, and told the agents he remembered seeing two long guns in the President's room.

At this point, two of the agents left the room for approximately twenty-three minutes, during which time the remaining agent and PALACIOS engaged in small talk.  When PALACIOS asked to use the bathroom, the agent said he could, noting it was just the two of them in the room. When one of the two agents returned to the room with more water, PALACIOS, for the first time, asked what was going to happen to him.  The agent said he did not know, and they explained they would need to speak with the prosecutors on the case regarding next steps.  The third agent eventually returned, and they showed PALACIOS the same photographs he had reviewed throughout the interview, and they asked him to write the person's name and his initials on each photo he recognized.

The agents next told PALACIOS the interview was nearly over and offered him a final opportunity to either supplement or change his statements.  PALACIOS responded that they (the Colombians) were told they were going to seize $42 million dollars as evidence when they arrested the President.  The agents reminded him that they would not be offended if he had lied to them during the interview, but they wanted to give him the chance to be honest.  At this time, PALACIOS asked the agents to turn off the camera, and the agents turned off one of the recording devices

Another device continued recording.  That recording shows that, after again using the restroom, PALACIOS asked the agents "what I want to-want to know is what are the guarantees,

what are the guarantees of—what is going to happen with me.  That's what I want to, uh, wanted to know what will happen with me after—after all that." (Exhibit 2 at MAOO002674).  The agents responded that they could let the prosecutors know that PALACIOS had told them the truth.  The agents explained that PALACIOS could not be used as a witness if he was dishonest or only partially honest, to which PALACIOS responded "there is another little thing there… that I have to tell you, but that's what I am referring to." (Exhibit 2 at MAOO002674).  The agents informed PALACIOS that:

> Guarantees? Look, I'll be honest with you.  I can't give you any guarantees, as I explained to you.  What I can do is talk to the prosecutors and tell them: "Look, this is what he told us.  What can we do with him or for him?" He- I won't lie to you.  I won't promise you "No, don't worry.  Nothing will happen to you.  You will return to Colombia, no problem.  We will use you as a witness.  You live in peace, and that's it." That's the rea—that is not the reality. Because what happened, the facts, let's be honest, that was something very violent, right? That was a blow against another country, and- and the result was that the--a president was murdered.  That's the reality. [pause] You are in-in-in-in a unique position, I would say, right? Because… your partners, who are in Haiti, they told us the version that- that we think is the truth, and they can't be provided with any support, because they're in Haiti.  Your situation is completely different.  We are at a point where, what are we going to do? Are we going to take this road, or are we going to take this one? And that's why, during that conversation we were having, or that we had, we gave you that opportunity, because we already know.  Many answers to the questions I asked you, we asked you, we already know.  That's why we always say that the truth is what helps you

*Id*.  PALACIOS responded, "Everything I've said is- is true — But a few little things are missing, but that's what I was referring to, about [UI]." (Exhibit 2 at MAOO002674).  The agent told PALACIOS that PALACIOS could withhold the "little things," although the agent did not recommend it.  PALACIOS responded:

> No, well, I came here with Don Carlos' [Colombian CO] help, who spoke with you, and helped me- me- me get out of here—from where I was.  Well,

> I told him: "I am going to tell them the truth.  I am going to tell the truth."
> He told me, "Well, tell the—the truth, which is the best option" he told me,
> "It's the best option." But he never told me what would happen with me.
> None of that.

Id.

The agents explained to PALACIOS that he "would face justice" for what happened but he could do so either as a witness or as a defendant.  When PALACIOS asked what it meant to be a witness, the agents stated:

> Certain consider- considerations are given a witness who- who gives
> testimony, which is the truth, in a case taking place or a trial taking place in
> the United States.  Right? It's like collaborating.  When one collaborates,
> maybe, I can't guarantee it, in the end, it is the judge who decides, right?
> Uh, how the government of the United States will help you.  For example,
> if it is a 20-year sentence, and the judge says: "No, well, let's give him 10."
> That's an example.  I don't know if- if I'm being clear.  That's only an
> example.  What we do as investigators, and our conversation with the
> prosecution is this.  We talk to the prosecution, and the prosecution presents
> their recommendation to the judge.  And that would be in conjunction with
> your defense attorney, right? That's- that's the, uh, situation.  In the end, the
> judge decides.  Not me.

(Exhibit 2 at MAOO002679)  PALACIOS then expressed "I'm not afraid of the truth, but of—of going to prison." (*Id.*)  The agent responded "Prison—it all depends on what you do.  You control- you have more control over what happens than we do, honestly." (*Id.*)  After several minutes, the agent stood up and turned the recording device back on.  During this approximately eleven-minute exchange, PALACIOS was not restrained, nor did he state he wished to stop speaking with agents or otherwise attempt to terminate the interview.[3]  In fact, he continued the interview.

---

[3]      Contrary to the assertion set forth in his motion (DE 74 ¶10), as corroborated by the recording, PALACIOS did not ask the agents if he could return to Colombia during this break.

After the agents turned on the other recording device, one of the agents asked PALACIOS to "tell us."  PALACIOS stated that, the night before the assassination, he was told that the President had to be assassinated.  PALACIOS went into more details about the meeting where it was announced that the President would be assassinated, and what happened when they entered the Presidential residence, noting they had been fired upon.

The agents asked where the President was located in the bedroom, and PALACIOS stood up to demonstrate for the agents.  PALACIOS was emphatic that he did not know or see which of his colleagues killed the President.  One of the agents touched PALACIOS's elbow and calmly stated "sit down, calm down," to which PALACIOS responded, "yes sir," and sat down.  (Exhibit 2 at MAOO002867-8).  PALACIOS continued to provide details of what happened at the President's residence, and answered sporadic questions posed by the agents.

At the end of the interview, the agents turned off the cameras.  The agents explained to PALACIOS that, since he was in Jamaica illegally, the Jamaican police requested to ask him how he entered the country.  The U.S. agents were present with PALACIOS as he spoke with Jamaican police, and they noted he was uncomfortable with the Jamaican officers, and he provided them vague answers.  PALACIOS spent the evening in the hotel room with two Jamaican police officers.  The agents were across the hallway and provided him with food, a change of clothes and toiletries to shower.  The following day, PALACIOS was taken to a Jamaican jail on immigration charges.

Throughout the course of the interview on October 7, 2021, and as is evident in the video recording, the agents spoke to PALACIOS in a calm and respectful manner.  Apart from a single instance where an agent tapped PALACIOS in an effort to calm him, the agents never put their hands on PALACIOS.  PALACIOS was never restrained.  Instead, he sat on a large couch with a

glass of water in front of him.  The agents repeatedly asked PALACIOS if he wanted water, food, or restroom breaks.  The video shows a man who was not threatened but weighed by the reality of having been on the run for three months after participating in a presidential assassination, and, as he expressed in the van, felt safe for the first time now that he was in the presence of the U.S. agents, which he had requested.

      **B.**        **October 12, 2021, Interview**

On October 12, 2021, Jamaican police transferred PALACIOS from Jamaican custody back to the same hotel.  The interview took place in the same hotel room as the original October 7, 2021, interview, with two of the same agents.  As with the prior interview, neither of the agents were armed.  PALACIOS sat in the same sofa as before.  Like the first interview, this meeting was also recorded.  While PALACIOS was in the interview with the agents, he was not restrained or handcuffed.

Because they were aware that PALACIOS had been in a health clinic, the agents asked PALACIOS about his health.  He responded that he felt sick, had been taken to the hospital, and felt tired and hungry.  Over the next hour and a half, PALACIOS complained to the agents of various things and asked them a series of questions.  Throughout this time, as with the prior interview, the agents spoke to PALACIOS in a calm and respectful manner, even as PALACIOS became more agitated.

First, PALACIOS complained of being in Jamaican custody, noting that he had agreed with his Colombian CO that "I will go with them [U.S. law enforcement]." (Exhibit 4 at MAPP002890).  The agents explained to PALACIOS, that, as they discussed at the end of their last meeting, the defendant was being held in Jamaican custody because he entered Jamaica illegally.  However, the

agents told PALACIOS they were trying to get him to the United States to continue cooperating, if that was what he wanted to do.  In the video, PALACIOS is seen looking into the face of the agent, nodding his head and responding "Yes" several times.  (Exhibit 3A at 5:00).  PALACIOS next asked how long it would take to get him to the United States.  When the agents responded that they did not know exactly, PALACIOS asked the agents to get him moved to the holding cell where he was initially held in Jamaica.  The agents stated they could not promise anything but that they would look into it.

PALACIOS next asked the agents to tell him specifically what would happen to him when he arrived in Miami, since PALACIOS expressed concern for himself and his family.  The video shows that the agents patiently explained that PALACIOS would be charged with a crime, likely a conspiracy, placed in jail, and appointed an attorney if he could not afford one.  They explained that he would be in contact with his defense attorney, who could also be the person to communicate with his family in Colombia.  PALACIOS asked how long he would spend in jail, and the agents answered that they could not tell him how much time he would serve, and they then explained the process again.  Throughout this interaction, PALACIOS listened attentively and calmly to the agents.  The agents told PALACIOS they would give the prosecutors the information he provided, and they again highlighted the importance of telling the truth.  PALACIOS interrupted the agents and said he told them the truth in the interview, referring to the October 7, 2021, interview.

An agent asked PALACIOS if his previous interview on October 7, 2021, was voluntary, to which PALACIOS hung his head and remained silent for over 10 seconds.  (Exhibit 3A at 12:05-12:20).  The agents asked PALACIOS if anyone had forced him to speak in that prior interview, to which PALACIOS quietly responded "no" and shook his head no.  The agent again inquired if

the first interview was voluntary, to which PALACIOS shook his head up and down in an affirmative motion.  (Exhibit 3A at 12:30; *see also* Exhibit 4 at MAPP002895).

The agents also reviewed the medication PALACIOS brought with him, such as vitamins, eye drops, and pain medication for a pre-existing back injury, and made sure he took them.  They asked PALACIOS if he was in the mental state of mind to speak with them, and if he was "comfortable" to continue.  PALACIOS responded that he was.  (Exhibit 4 at MAPP002904).  Up to this point, an hour and a half had gone by.  This first hour and a half of the interview consisted not of an interrogation, as the defendant asserts in his motion (DE 74 at ¶ 18), but of PALACIOS asking the agents questions.  Answering PALACIOS's questions took time, and the agents patiently, calmly, and respectfully took the time to respond to his inquiries.

After answering PALACIOS's questions, the agents informed him that his situation was different now because he was in Jamaican custody, something that was not the case in the original meeting on October 7, 2021.  As such, the agents explained that they had to notify him of his *Miranda* rights because he was in foreign custody.  An agent said he was going to review the document, explain some things, and if PALACIOS was still willing to speak to them, then they would all sign the paperwork.  The agent explained that this was something to protect both him and the agents, to show that all agreed to have the conversation.  The agents asked PALACIOS if he agreed, and PALACIOS answered "yes."  (Exhibit 4 at MAPP002904).

The agent proceeded to place the International Advice of Rights Form on the coffee table angled towards PALACIOS so he could read along with the agent.  The agent then read each line in Spanish, slowly, pausing after each sentence.  The agent read:

> We are representatives of the Unites States government.  Although we are
> not in the United States of America the U.S. laws provide you with certain

13

rights when dealing with us.  Before we ask you any question you have to understand your rights.  You have the right to remain silent even if you have already talked to other people, you don't have to talk to us at this time.

(*Id*.).  After this statement, the agent went off the page and said "Right? We are talking about doing this voluntarily, like you did on Thursday" to which PALACIOS is seen nodding his head "yes." The agent continued to read from the International Advice of Rights form:

> Anything you say can be used against you in a court, court.  We talked about that.  There will be a trial, a trial will happen, right? You have the right to talk to a lawyer for counsel before we ask you any questions.  You have the right to have a lawyer present during your interrogation.  If you don't have the means to pay for a lawyer, you have the right to have one designated to you before any questions are asked, if that is what you want.  However, the possibility of providing a lawyer at this time can be limited by the decisions made by the local authorities or by the availability of a lawyer qualified in the United States.  If you decide to answer the questions at this time, without the presence of a lawyer, you have the right to stop answering at any time. Ok?

(Exhibit 4 at MAPP002905).

The agent asked PALACIOS about a comment PALACIOS made during the October 7, 2021, interview where he (PALACIOS) mentioned there was a communication in a chat about an attorney.  Over the next ten minutes, PALACIOS explained he did not have an attorney, but an attorney was representing the family members of the Colombians in Haitian custody.  PALACIOS stated the Colombian attorney told him he should surrender to the Colombian embassy, but PALACIOS was concerned that Colombian authorities would deliver him to the Haitian government.[4]  The agents again clarified with PALACIOS that he did not have an attorney, which

---

[4]      Defense argues that PALACIOS originally thought the interview would take place in the embassy (DE 74 at ¶ 7), however, PALACIOS told the agents that he did not feel safe going to an embassy for fear that he would have been returned to Haiti.

PALACIOS confirmed.  The agents then turned back to the International Advice of Rights Form, and PALACIOS asked if the form was from the Jamaican authorities, and the agents clarified that it was not, that it was from the United States.  The agents again explained that PALACIOS needed to sign the form if he wanted to speak with the agents.

Once again, as the agents were trying to explain to PALACIOS his rights, they were sidetracked by answering more of his questions.  This time, PALACIOS explained that he was upset with how he was brought to the prior interview.  The agents expressed that they wanted to answer PALACIOS's questions, but they went back to the International Advice of Rights Form and told PALACIOS that, for them to continue speaking, PALACIOS needed to understand his rights and agree to speak with them.  The agents again told PALACIOS that he was not signing a declaration, he was signing a form showing he was informed of his rights and that he wanted to speak with the agents.  The agents told him he could stop speaking at any time.  The agents asked PALACIOS if he was ready, and after a few seconds, PALACIOS very quietly responded "okay." (Exhibit 4 at MAPP002915).

The agent asked PALACIOS to read the last paragraph on the International Advice of Rights Form under the heading "Consent."  PALACIOS responded that his "eyesight is not so good," and asked the agent to read the final paragraph to him, which the agent did.  PALACIOS stared at the form, to which the agents asked, "what questions do you have?"  (Exhibit 4 at MAPP002916).  PALACIOS responded, "[l]et's sign then, because . . ." The agents said: "Okay. Look, here print your name, your signature, my signature and that's it.  And we can begin."  The agent handed the pen and the form to PALACIOS.  Pen in hand, PALACIOS said "And, you guys

15

have that recording with what I said that day, [UI]." To which the agent responded "Yes, we have it.  Your signature, please."  (*Id.*)  PALACIOS signed the form.  *See* Exhibit 6.

The interview continued, during which PALACIOS continued to ask more questions; he provided more details of the events he described in the October 7, 2021, interview, including that he learned of the plan to kill the President the night before entering his home.  PALACIOS also reaffirmed that he wanted to come to the United States voluntarily, that he understood he would need to accept responsibility for his criminal conduct, and that he wanted to cooperate with the U.S authorities.

## II.    Legal Analysis

### A.    The Defendant's Pre-*Miranda* October 7, 2021, Interview

The defendant seeks to suppress his statement on the ground that the statement was obtained in violation of the Fifth Amendment to the United States Constitution because agents did not read him his *Miranda* rights before he made a statement.  The defendant's argument fails on the merits.

In *Miranda v. Arizona*, the Supreme Court held that warnings are only required when an individual is subject to a "custodial interrogation."  384 U.S. 436, 444 (1966).  Law enforcement must read *Miranda* warnings only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006).  The test to determine whether a person is "in custody" is whether "under the totality of the circumstances, a reasonable [person] in the suspect's position would feel a restraint on his freedom of movement . . . to such an extent that he would not feel free to leave." *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987); *see United States v. Long*, 866

16

F.2d 402, 405 (11th Cir. 1989) ("A suspect is considered in custody if a reasonable person would believe that he was not free to leave; for example, if the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.").

The defendant bears the burden of establishing that he was in custody for purposes of Miranda. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).[5]  The test is an objective one: the subjective beliefs of the defendant and of the interviewing officers as to whether the defendant was free to leave are irrelevant.  *See Stansbury v. California*, 511 U.S. 318, 323-24 (1994).  Stated more precisely, the question of whether a person is in custody is viewed from the perspective of a reasonable person in the position of the suspect.  *United States v. Hunnerlach*, 197 F.3d 1059, 1066 n.8 (11th Cir. 1999); *see also*, *United States v. Adams*, 1 F.3d 1566, 1575 (11th Cir. 1993).

Where a defendant requests a meeting with law enforcement, such a meeting is not typically considered "custodial."  *See Hunnerlach,* 197 F.3d at1066 n.8.  When a defendant's attendance at a meeting is voluntary, the meeting is not a "custodial interrogation" for the purposes of triggering even the most basic of the Fifth Amendment protection—the *Miranda* warnings.  *See e.g.*, *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (defendant that came to police station *voluntarily*, though at the request of police officer, was not subject to custodial interrogation to trigger *Miranda*) (emphasis added).  "An interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of

---

[5]  *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (the Eleventh Circuit adopted as binding precedent all decision of the former Fifth Circuit issued before October 1, 1981).

a crime suspect,' does not automatically create a custodial situation." *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013)(*quoting United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000); *see also Phillips*, 812 F.2d at 1360 (citation omitted) (*quoting Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984)) ("'[T]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]'").

To determine whether PALACIOS was in custody, the Eleventh Circuit requires consideration of the totality of the circumstances, including factors such as whether the agents "brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," as well as "the location and length of the detention." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010).  An important factor in determining whether a defendant was "in custody" is the location of questioning.  While not conclusive, "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *United States v. Brown,* 441 F.3d 1330, 1348 (11th Cir. 2006); *see also United States v. Roark*, 753 F.2d 991, 993 (11th Cir. 1985) (defendant who "was interviewed at her place of work, was not placed under arrest or told not to leave, and was not threatened or coerced in any manner" was not "in custody").

Considering the totality of the circumstances of the October 7, 2021, interview, PALACIOS was not subject to a custodial interrogation sufficient to trigger *Miranda*.  PALACIOS requested the meeting with the agents.  As such, his case is easily distinguished from those the

18

defense cited in their motion.[6]  PALACIOS agreed to meet with the agents with the idea of cooperating with the American authorities.  PALACIOS selected the location of where the agents would pick him up.  PALACIOS came out of hiding after seeing the cars and he approached the agents.  PALACIOS carried a machete, which raised safety concerns and justified a security pat down of the defendant.  After the agents secured the weapon, PALACIOS entered the van and chose his own seat; and no one restrained him in any way.  PALACIOS expressed relief upon seeing the agents and he sobbed about the horrendous conditions he had experienced fleeing Haiti. They gave him food and drinks, and PALACIOS idly chatted about personal matters with the agents in the van as they drove over two hours from the rural location where they met him to a safe and neutral location to sit down and talk.

As agreed, the first interview took place in a hotel room.  PALACIOS had expressed concerns that a meeting at an embassy might trigger his extradition to Haiti.  In the hotel room, PALACIOS sat unrestrained on a couch.[7]  The agents present in the hotel room were not armed.

In support of his argument that this was a custodial setting, PALACIOS later complained about being searched when he was picked up by the agents, stating "Why so much violence?  I

---

[6]     *See United States v. Hanson*, 237 F.3d 961 (8th Cir. 2001) (federal agents had approached defendant at his home in connection with their investigation); *United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010) (defendant first approached at his home after law enforcement executed a search warrant at that premises); *Orozco v. Texas*, 394 U.S. 324, 325-56 (1969) (law enforcement approached defendant at his residence at 4 a.m. and began questioning him); *United States v. Mittel-Carey*, 493 F.3d 36, 39-40 (1st Cir. 2007) (defendant first approached at his home after law enforcement executed a search warrant at that premises); *United States v. Cavazos*, 668 F.3d 190, 194-95 (5th Cir. 2012) (defendant questioned, while handcuffed, at his residence after law enforcement executed a search warrant there).

[7]     Contrary to defense assertions (DE 74 at ¶ 7), no armed Jamaican police officers remained outside of the hotel room.

was not liking it." DE 74 at ¶ 5.  The defendant ignores the fact that PALACIOS, a former elite Colombian soldier who was involved in an assassination, was in possession of a machete–a weapon that posed a danger to the safety of the agents.  The defendant similarly failed to mention that this complaint was immediately preceded by PALACIOS expressly stating he voluntarily met with law enforcement: "If I'm going to voluntarily turn myself in, then I'm obviously not going to have weapons.  I don't have weapons."  This statement highlights the non-custodial nature of the first interview when he admitted that he went "**voluntarily [to] turn myself in**."  (Exhibit 4 at MAPP002925)  (Emphasis added).

Moreover, throughout the entirety of the October 7, 2021, interview, PALACIOS sat calmly and comfortably on a sofa while the agents remained in their seats at a reasonable distance from PALACIOS.  During the interview, the agents never touched PALACIOS in an offensive or aggressive manner, placed him in restraints or restricted his movements.  The agents repeatedly asked PALACIOS if he needed food, water, or a break to go to the restroom.  The agents patiently listened to PALACIOS as he went through his story, and they occasionally interjected by asking clarifying questions.  As evidenced in the video of the meeting, PALACIOS spoke freely with the agent while he relived the events that occurred before, during and after the assassination of the Haitian President.  As PALACIOS stated at the very beginning and repeated at the end, PALACIOS was there of his own free will.  This was not a custodial interrogation, rather it was a voluntary interview that PALACIOS had requested with U.S. authorities.

The fact that PALACIOS was taken into Jamaican immigration custody after the October 7, 2021, interview does not alter the analysis of whether this was a custodial interrogation mandating *Miranda* warnings.  Restriction on movement is not always enough to trigger

20

*Miranda*—as even an inmate in prison may not be in custody for purposes of *Miranda* if the circumstances surrounding the interview do not exert "the coercive pressure that *Miranda* was designed to guard against." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). As the Supreme Court explained in *Howe v. Fields*, the circumstances of an interview—whether in prison or elsewhere—can lack "the shock that very often accompanies arrest." 565 U.S. 499 at 511 (2012). This kind of shock, which follows when a person is "cut off from his normal life and companions" and "abruptly transported from the street into a police-dominated atmosphere," can create pressure to speak, as one may "hope that, after doing so, he will be allowed to leave and go home." *Id.* (quotations omitted). A court still must consider "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 509; *see also United States v. Woodson*, 30 F.4th 1295 (11th Cir. 2022).

Here, the U.S. agents never restrained PALACIOS and they never told him he could not leave. The U.S. agents never threatened PALACIOS that he would be taken into Jamaican custody if he did not speak with them. In fact, it was not until after the entirety of the interview that PALACIOS was made aware that Jamaican immigration authorities wanted to speak with him about how he entered Jamaica. The fact that PALACIOS was later taken into Jamaican immigration custody after the interview did not convert the interview into a custodial setting, particularly in light of the other factors that demonstrated the lack of a coercive environment.

In sum, the totality of the circumstances establishes that a reasonable person in the defendant's position would not have felt that his freedom was restrained to the degree associated with a formal arrest. Accordingly, the defendant's motion to dismiss on this ground should be denied.

21

**B.     The Defendant Knowingly and Voluntarily Waived His Rights Under *Miranda***

Next, the defendant argues that the October 12, 2021, custodial interview should similarly be suppressed because the defendant's *Miranda* waiver was ineffectual.  (DE 74 at 15).  This argument likewise lacks merit.  As a threshold matter, defendant argues his *Miranda* waiver was flawed because the agents incorrectly informed PALACIOS that there were limitations on finding "qualified lawyers" in the United States.  *See* DE 74 at ¶ 18.  This argument relies on a draft translation, which, in this case, was an incorrect translation.  The agent informed the defendant: "However, our possibility of providing a lawyer at this time can be limited by the decisions made by the local authorities or by the availability of a lawyer qualified in the Unites States."  This accurately states that the agents may have difficulty finding a lawyer in Jamaica who was qualified to practice in the United States.  (Exhibit 4 at MAPP002925; *see also* Exhibit 6).  As discussed below, stating this practical reality of a conducting an investigation on foreign territory did not taint PALACIOS's knowing and voluntary waiver.

Indeed, courts have acknowledged, "where *Miranda* has been applied to overseas interrogations by U.S. agents, it has been so applied in a flexible fashion to accommodate the exigencies of local conditions[which] is wholly consistent with our reading of the Supreme Court decisions construing the *Miranda* framework."  *United States v. Odeh (In re Terrorist Bombings of the U.S. Embassies in E. Afr.)*, 552 F.3d 177, 205 (2d Cir. 2008).  As the Supreme Court explained in *Duckworth v. Eagan*, the "*Miranda* warnings [need not] be given in the exact form described in that decision."  492 U.S. 195, 202 (1989).  When the U.S. government provides a *Miranda* warning outside of the United States, the government advises the foreign suspect that, even though not in the United States, U.S. laws provide for certain rights to foreign suspects.

However, unlike warnings to U.S. citizens, the foreign suspect also is advised that the United States' ability to provide the suspect with counsel at the time of the questioning may be limited by the decisions of the local authorities or the availability of an American-trained attorney. *See United States v. Dopf*, 434 F.2d 205, 207 (5th Cir. 1970) (upholding the admissibility of statements obtained in a custodial interview held in Mexico by a U.S. agent who warned the suspects that "he could not furnish them with a lawyer in Mexico but offered to contact the American Consul on their behalf.").

As such, courts have found no error where traditional *Miranda* waivers issued abroad are modified to note that it may be difficult to obtain counsel licensed to practice in the United States. For example, in *Cranford v. Rodriguez*, 512 F.2d 860 (10th Cir. 1975), the Tenth Circuit considered a challenge to a waiver form brought by a defendant initially detained in Mexico by Mexican authorities and subsequently questioned there by U.S. agents. After rejecting the argument that *Miranda* did not apply outside the United States, *id.* at 863, the Tenth Circuit considered the sufficiency of a standard waiver form modified to omit "the line respecting appointment of a lawyer and inserting instead that if [the suspect] wished to consult the American Consulate the latter would be advised of his detention and '[the suspect] will be given the opportunity to talk to a Consulate representative,'" *id.* at 862. The Tenth Circuit considered this "variation" of the standard *Miranda* warnings to be "unavoidable [due to the lack of availability of a U.S. lawyer in Mexico] and not prejudicial." *Id.* at 863. It stated that "[t]he petitioner was admonished that he need not speak; that he was [informed that he was] entitled to talk to a Consulate official; that anything he said could be used against him in court; and that if he decided to answer questions without a lawyer he could stop at any time." *Id.* The Tenth Circuit held that

this "good faith effort" to inform a suspect of his rights complied with the *Miranda* framework. *Id.* As such, the International Advice of Rights Form used by the agents correctly informed PALACIOS of his legal rights.

The defendant further contends that his post-*Miranda* waiver statements must also be suppressed because they were the product of a statement obtained in violation of his Fifth Amendment rights. The statements given by PALACIOS prior to the *Miranda* warnings, however, were voluntary, and once PALACIOS was read his *Miranda* warnings, his waiver of those rights was knowing, voluntary, and intelligent. Neither his health, the medication he was taking, his conditions of confinement in a Jamaican jail, nor his lack of familiarity with the U.S. legal system, rendered PALACIOS's waiver unknowing or involuntary. PALACIOS not only waived his *Miranda* rights verbally, but he also reduced his waiver to writing. Therefore, PALACIOS's argument that his "post-*Miranda* statement should be suppressed as tainted by the pre-*Miranda* questioning," is without merit.

Nevertheless, even assuming *arguendo* PALACIOS's pre-*Miranda* October 7, 2021, statements did constitute a custodial interrogation that ran afoul of his *Miranda* rights, any statements given after *Miranda* are admissible as long as they are voluntary. *See Oregon v. Elstad*, 470 U.S. 298, 317–18(1985). Agents read PALACIOS his rights from the International Advice of Rights Form, and he indicated he understood his rights. He spent over an hour asking the agents questions, and all were answered. The agents also diligently explained the defendant's rights to him. They informed him that even if he signed the form, he could stop answering questions at any time. They explained the form was to protect him as well as themselves, and to ensure that he was agreeing to speak with the agents. This was coupled with repeated efforts to prevent him from

24

continuing to speak to them until they had completed the advice of rights.[8]  Due to all of the questions PALACIOS raised and comments he made, this took over an hour.  During this time the agents were not asking questions, but responding to his inquiries.  It was after all his questions were answered that PALACIOS signed the waiver.  On these facts, his waiver was both knowing and voluntary.  *See United States v. Lopez-Garcia*, 565 F.3d 1306, 1318–19 (11th Cir. 2009) (finding second confession was knowingly and voluntarily made after first un-Mirandized first confession because agent read Lopez–Garcia his rights in Spanish and gave him the opportunity to ask any questions he might have had, Lopez–Garcia unequivocally acknowledged that he understood his rights before signing the waiver form, law enforcement was unarmed during the interrogation, and Lopez–Garcia appeared "calm" throughout the meeting); *Street*, 472 F.3d at 1313–14 (finding that under the *Elstad* general rule, even though Street first confessed without the required *Miranda* warnings, the second statements Street made after he was fully advised of his Miranda warnings are admissible, because all of his statements were knowingly and voluntarily made; Street was questioned in his home; he was not threatened or coerced; he was not confined or restrained; the questioning was done in a conversational tone; it was not unduly prolonged; he was told of some of his rights early on; and given his twenty-plus years of law enforcement experience, Street was familiar with investigative processes and techniques).

---

[8]      Such efforts make clear that, contrary to defendant's assertions, the instant case is not an example where "a two-step interrogation technique is used in a calculated way to undermine the *Miranda* warning" (DE 74 at 16).  Nor can two interviews conducted five days apart be reasonably compared, as defendant urges, to "midstream" *Miranda* warnings issued in the same interview 15-20 minutes after unwarned admissions (*id.*).

Contrary to the defendant's contention (DE 74 at 17), the delay in completing the International Advice of Rights Form was not due to the agent's manipulation of PALACIOS, but of answering his multitude of questions, which took over an hour.  Nor did the agents mislead PALACIOS (DE 74 at 19), as the agents read PALACIOS each right, line by line from the International Advice of Rights Form.  As discussed above, this form accurately and correctly informed PALACIOS of his rights.  His waiver of these rights was knowing and voluntary.

Accordingly, the Government respectfully requests that PALACIOS's motion to suppress statements be denied.

Respectfully submitted,

MATT G. OLSEN
ASSISTANT ATTORNEY GENERAL

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By:    /s/ *Frank V. Russo*
       /s/ *Emma Ellenrieder*
       Trial Attorneys
       Court ID No. A5502917
       Court ID No. A5502918
       National Security Division
       Department of Justice
       950 Pennsylvania Avenue
       Washington, DC  20530
       Telephone: (202)307-2898
       Email: Frank.Russo2@usdoj.gov
       Emma.Ellenrieder@usdoj.gov

By:    /s/ *Andrea Goldbarg*
       /s/ *Monica K. Castro*
       Assistant United States Attorneys
       Court ID No. A5502556
       Court ID No. A5502776
       U.S. Attorney's Office
       Southern District of Florida
       99 N.E. 4th Street
       Miami, FL 33132-2111
       Telephone: (305) 961-9000
       Email: Andrea.Goldbarg@usdoj.gov
       Email: Monica.Castro@usdoj.gov

26

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I filed the foregoing document with the Clerk of the Court using CM/ECF, and served a copy to defense counsel by ECF and email, on or about December 21, 2022

_/s/ Andrea Goldbarg_____
Assistant United States Attorney